**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Alan Louis BASHARA, Defendant–**
**Appellant.**

No. 93–2020.

United States Court of Appeals,
Sixth Circuit.

Argued March 11, 1994.

Decided July 5, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 18, 1994.*

* Merritt, Chief Judge, would grant rehearing for the reasons stated in his dissent.

Brian K. Delaney (argued), James R. Redford (briefed), Office of the U.S. Atty., Grand Rapids, MI, for plaintiff-appellee.

Judy E. Bregman (argued and briefed), Grand Haven, MI, for defendant-appellant.

Before: MERRITT, Chief Judge; GUY and BOGGS, Circuit Judges.

BOGGS, Circuit Judge, delivered the opinion of the court, in which RALPH B. GUY, Jr., Circuit Judge, joined. MERRITT, Chief Judge (p. 1186), delivered a separate dissenting opinion.

BOGGS, Circuit Judge.

Alan Louis Bashara was charged in a two-count indictment for his role in a drug conspiracy that also involved money laundering. Five days before his trial was to begin, Bashara pleaded guilty to both counts. However, eight days before his sentencing, he moved to withdraw his plea. The court rejected his motion and sentenced him to a 97-month prison term, followed by five years' supervised release. Bashara appeals from his conviction and sentence, claiming that he should have been permitted to withdraw his plea, that he was not properly notified by the court that he would face a mandatory minimum sentence for one of the crimes to which he pleaded guilty, and that the court improperly calculated his total offense level under the sentencing guidelines. For the reasons set forth below, we affirm.

## I

Bashara was in the business of promoting music concerts in Grand Rapids, Michigan. He also promoted Luigi Buzzitta's hair salon. In time, he and Buzzitta used drugs together. In July 1991, Buzzitta and another person were arrested and charged with conspiracy to possess marijuana. Buzzitta entered into a deal with the government, offering to help them uncover a trafficker of marijuana and heroin. He agreed to purchase cocaine from Bashara, and his efforts led to Bashara's arrest and conviction.

Through their investigation, the police learned that Bashara sold marijuana in Michigan and used the proceeds to purchase heroin from Daniel Okane, a supplier in California. Bashara paid Okane by wiring money through Western Union. Okane shipped the heroin in compact-disc cases and film-reel tins under the guise of Bashara's concert-promotion business. Bashara made at least sixty-five such payments, transferring at least $41,000 to pay for more than 130 grams of heroin, perhaps more than 200 grams. Bashara conceded that some of those purchases were transactions in which he pooled his money together with others so that they could receive a volume discount. As part of his marijuana dealing, Bashara drove alone at least two or three times to Texas, loaded his trunk with marijuana obtained on behalf of Leonard Sillman, a supplier in Grand Rapids, Michigan, to whom Bashara owed debts from loans for prior drug buys, and drove the drugs back to Michigan for him. Although most of the marijuana transported this way was sold by Sillman's people in Michigan, Bashara was sold some of the marijuana for his own account.

Police executed a search warrant on Bashara's premises in April 1992 and seized some drugs. Days later, he voluntarily visited IRS Agent Jurkas, who was investigating the money-laundering charges, and he told her about his involvements with Buzzitta and Okane. He concedes that she warned him not

to speak without a lawyer present and that he was offered nothing in return for his revelations. In June, he again spoke to Jurkas and federal drug agents voluntarily, this time accompanied by counsel. He elaborated on his previous statements, naming individuals from whom he was buying, and to whom he was selling, marijuana. Again, he received no promises.

Bashara was charged on November 5, 1992, in a two-count indictment. Count 1, without specifying any quantities, charged conspiracy to possess with intent to distribute, and conspiracy to distribute, marijuana. 21 U.S.C. §§ 841(a)(1), 846. Count 2 charged money laundering, in connection with his use of the proceeds from his marijuana dealing to purchase heroin for himself and other people. 18 U.S.C. § 1956(a)(1)(A)(i).

On February 11, 1993, five days before his trial was to begin, Bashara pleaded guilty to both counts. However, on April 21, eight days before sentencing, his attorney, Mitchell, moved to withdraw the guilty plea, and he also moved to withdraw as defense counsel. The district court refused to allow withdrawal of the guilty plea, but did permit Mitchell to withdraw. A second attorney was appointed and later withdrew. Present defense counsel was appointed in May 1993.

In seeking unsuccessfully to withdraw his guilty plea, Bashara claimed that, although he had received nothing in writing and did not enter into any formal agreement, he understood from the government that neither of his crimes carried a mandatory minimum sentence. Apparently, Bashara hoped that the court would view his acceptance of responsibility as a reason to give him a comparatively light sentence, and he further presumed that he would benefit from a formal sentencing reduction for accepting responsibility. Ultimately, he did receive a two-level reduction for "acceptance of responsibility," but he also learned at sentencing that his drug crime required a minimum five-year sentence for a first-time offender and a minimum of ten years for a prior offender.

Claiming that he did not fully understand the implications of his guilty plea, that he did not really understand the money-laundering charge, that he would never have pleaded guilty if he had known that the drug charge carried a mandatory minimum sentence regardless of his cooperation, and that he entered into the plea under pressure because he felt that Attorney Mitchell was not sufficiently prepared for trial, Bashara sought to withdraw his guilty plea. However, the court denied that motion and found that he well understood, and had been adequately apprised of, the implications of the guilty plea when he entered it.

In sentencing Bashara, the court enhanced his base offense level of 26 by three levels for his role as a manager or supervisor of a criminal activity that included five or more people, U.S.S.G. § 3B1.1(b), and then reduced the level by two levels for his acceptance of responsibility, id. § 3E1.1(a), resulting in a total offense level of 27. Bashara claimed that he was not a manager or leader of anything, and that there were not even five people involved in his activities. He also contended that he should have received a three-level reduction for accepting responsibility because his total offense level was more than 15. Id. § 3E1.1(b). However, the court rejected that claim because Bashara had waited until the final days prior to trial before he pled guilty and finally accepted responsibility.

With a total offense level of 27 and a criminal history category of II, Bashara faced a guideline sentencing range of 78–97 months. The court sentenced him to two concurrent sentences of 97 months, followed by concurrent supervised release terms of three years and five years.

## II

At the time that Bashara pleaded guilty in February, the district court asked him:

> Do you understand that these charges carry certain penalties which I must advise you of, and that is the penalty for conspiracy to possess with intent to distribute and [conspiracy to] distribute marijuana carries a possible prison sentence of up to 40 years in prison and/or up to a $2 million fine with a special release provision[,] if there is confinement[,] of up to five years

following confinement. Do you understand this? As a maximum sentence?

Bashara responded "Yes, Your Honor." The court later asked Bashara's attorney, "[A]re there any other sentencing provisions which you're aware of that should be discussed here at this time?" The attorney responded, "No, Your Honor."[1]

The first count to which Bashara pleaded guilty charged him with conspiring to possess with intent to distribute, and with conspiring to distribute, marijuana. 21 U.S.C. §§ 841(a)(1), 846. The count did not specify the quantity of marijuana involved. Sections 841(a)(1) and 846 do not mandate any minimum prison terms for the offense itself. However, under 21 U.S.C. § 841(b)(1)(B)(vii), if the crime involves 100 kilograms of marijuana, or its equivalent, there is a mandatory minimum five-year sentence, to be followed by a mandatory minimum four-year term of supervised release, for the first time that a person is convicted of such a violation. The mandatory minimums are doubled for subsequent offenders. A violation involving that quantity of drugs also carries a maximum prison sentence of forty years and a maximum $2,000,000 fine.

The government suggests that the district court had not yet determined the quantity of marijuana involved in Bashara's crime at the time that Bashara entered his plea. Furthermore, Bashara himself "never admitted to having been involved with 100 kilograms of marijuana and has contested the issue at every opportunity." Appellee's Brief at 4. On the other hand, the court's description of the maximum sentence facing Bashara indicates that the court did in fact know at the time that Bashara entered his plea that the ultimate sentence could be based on the quantities listed in § 841(b)(1)(B), which cov-

ers crimes involving at least 100 but less than 1000 kilograms of marijuana, or its equivalent.[2] That statute sets a minimum five-year sentence.

 On this appeal, for the first time, Bashara claims that he would not have voluntarily waived his right to a trial if the district court had notified him that he was pleading guilty to a crime that carried a mandatory minimum five-year prison term. Because he did not raise this objection earlier, Bashara's appeal is reviewed for plain error. The Federal Rules of Criminal Procedure require that a defendant who enters a guilty plea be apprised not only of the maximum penalty that he faces but also of the statutory minimum:

> (c) **Advice to Defendant.** Before accepting a plea of guilty ... the court must address the defendant personally in open court and inform the defendant of ... (1) the nature of the charge to which the plea is offered, the *mandatory minimum penalty provided by law,* if any, and the maximum possible penalty provided by law, including the effect of any special parole or supervised release term....
>
> ....
>
> (h) **Harmless Error.** Any variance from the procedures required by this rule which does not affect *substantial rights* shall be disregarded.

Fed.R.Crim.P. 11 (emphasis added). Where a district judge fails to advise a defendant of the minimum sentence that he faces, this court will remand with instructions to vacate the sentence and to permit a new plea. *See, e.g., United States v. Wolak,* 510 F.2d 164, 166 (6th Cir.1975). However, we will disregard such an omission where we find the

---

**1.** The text of the relevant colloquy at the guilty plea (R. 37, pp. 9–10), on whose interpretation the court and the dissent disagree, is Appendix I to this opinion.

**2.** If Bashara were to have been convicted of crimes involving 1000 kilograms of marijuana, or its equivalent, he would have faced a sentence carrying a mandatory minimum prison term of ten years, with a possible maximum of life imprisonment, and a $4,000,000 fine. 21 U.S.C. § 841(b)(1)(A). If he were to have been convicted of crimes involving less than 100 kilograms of

marijuana, or its equivalent, he would have faced a maximum sentence of twenty years and a $1,000,000 fine. *Id.* § 841(b)(1)(C). Thus, if the judge could definitively tell Bashara that he faced a maximum sentence of forty years and a maximum fine of $2,000,000, it seems that the judge had determined that Bashara's sentence could fall under the statutory framework of § 841(b)(1)(B), which deals with crimes involving at least 100, but less than 1000, kilograms of marijuana, or its equivalent.

error harmless because it has not affected the defendant's substantial rights. *United States v. Williams,* 899 F.2d 1526, 1531 (6th Cir.1990). *See generally United States v. Stead,* 746 F.2d 355, 356 (6th Cir.1984), *cert. denied,* 470 U.S. 1030, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985) (noting that the Congressional amendment in 1983 that enacted Rule 11(h) has "alter[ed] the approach this Court must now use in reviewing guilty pleas" because it incorporated into Rule 11 the harmless error standard of Rule 52(a) of the Federal Rules of Criminal Procedure). In this context, we have stated that "[s]ubstantial rights may not be affected when a defendant is informed of the maximum penalty and that penalty markedly exceeds the penalty the defendant received, including the period of supervised release and any additional incarceration time that might result from violation of [the] supervised release condition." *United States v. Syal,* 963 F.2d 900, 906 (6th Cir.1992).

In *Syal,* the district court had informed a defendant who pleaded guilty that his sentence could be a maximum of five years' imprisonment, but the court neglected to notify him that the sentence would include a mandatory period of supervised release. Ultimately, the defendant was sentenced to eighteen months' imprisonment and three years' supervised release. We vacated the defendant's sentence, noting that "the five year maximum sentence the District Court warned Syal of is not markedly greater than the sentence he received when the effects of supervised release are accounted for." We contrasted that case with *United States v. Bachynsky,* 934 F.2d 1349 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991).

In *Bachynsky,* the defendant faced a possible 25-year maximum sentence. He received a sentence of 121 months' imprisonment and three years' supervised release. The *Bachynsky* court calculated that, in the worst case for the defendant, he would (1) serve every day of his 121-month term in prison; (2) have his supervised release extended from three years to five years, pursuant to 18 U.S.C. § 3583(e)(2); (3) have his supervised release revoked on the last day of that five-year supervised release term; and (4) have to serve every day of his additional three-year imprisonment after revocation of supervised release, pursuant to 18 U.S.C. § 3583(e)(3). In that worst-case scenario, the defendant would serve 18 years and one month in prison, but nearly seven years less than the maximum sentence he could have received. 934 F.2d at 1353. We stated that, unlike Syal's circumstances, Bachynsky's were such that his substantial rights had not been affected. 963 F.2d at 906.

█ In this case, the court warned Bashara that he could have faced a statutory maximum term of forty years in prison. He received a sentence of ninety-seven months to be followed by five years of supervised release. Following the example of the *Bachynsky* worst-case scenario, we note that, under Bashara's sentence, he could serve as long as sixteen years and one month in prison, which would still be approximately twenty-four years less than the statutory maximum, a result even better for the defendant than the result in *Bachynsky:*

Furthermore, we note that the district court sentenced Bashara to the maximum term set by the sentencing guidelines for a defendant in criminal history category II with a total offense level of 27. Therefore, it is clear that he could have received at least five years' imprisonment even if his total offense level had been as much as four levels lower.[3] Indeed, at the time that he entered his plea, with a criminal history category of II and admitting guilt to two separate crimes, each of which carries a base offense level of 26, Bashara was facing a possible prison term of 70–87 months under the guidelines. That is, his guideline sentencing range, at the time that he pleaded guilty, indicated that he would receive a term of at least five years and ten months, even if the court were inclined to impose a minimum penalty. Even if he had been able to convince the court to reduce his sentencing

---

**3.** Under criminal history category II, an offense level of 27 indicates a term ranging between 78–97 months' imprisonment. Under that same history category, a total offense level of 23 indicates a term that ranges between 51–63 months.

range by two offense levels, for acceptance of responsibility, and to refrain from enhancing the range for other reasons, Bashara would have faced a sentencing range of 57–71 months, adequately warning him that he could be going to prison for at least five years. When he entered his plea, Bashara was accompanied by his counsel, and the court informed him that "there are certain federal [sentencing guidelines] that govern the sentence that this Court must impose, and ... this Court is required to consult those guidelines and this Court might depart from those guidelines under certain enumerated and narrow circumstances." Bashara stated that he understood that. Therefore, under the totality of the circumstances of this case, we cannot say that Bashara's substantial rights were violated by the district court's error when it neglected to advise him that he faced a minimum prison sentence of five years.

Indeed, during the hearing on his motion to withdraw his guilty plea, Bashara engaged in a revealing colloquy with the district judge, in which he explained the reason that he wanted to go to trial. Despite the conclusion in the dissenting opinion that defendant pled guilty only because he understood that the government would not seek a mandatory minimum sentence and that he sought to withdraw his guilty plea when he learned that he was subject to such a sentence, the record strongly implies otherwise. At the hearing, Joint Appendix at 117–18, Bashara focused solely on his desire to clarify his "level of culpability" based on what he contended were lies told by Buzzitta.[4] He never

mentioned the mandatory minimum issue and indeed, as indicated above, the mandatory minimum provision had almost no likelihood of affecting his sentence.[5] While it is unfortunate that the judge did not comply with that portion of the statute, Rule 11(h) is specifically designed for circumstances in which some portion of the sentencing statutes and rules is not complied with, declaring that "[a]ny variance ... which does not affect substantial rights shall be disregarded." In our case, not only did the sentence as actually given mean that the mandatory minimum had no impact, but any reasonable analysis of the situation at the time of the guilty plea would have indicated the same thing: this is not a case where it was any surprise that the actual sentence exceeded the mandatory minimum. We thus believe that it cannot be said, without some risk of terminological inexactitude, that Bashara was "affirmatively misled."

### III

Bashara also appeals from the district court's rejection of his motion to withdraw his guilty plea. We review the district court's decision for abuse of discretion. *United States v. Spencer*, 836 F.2d 236, 238 (6th Cir.1987).

"If a motion for withdrawal of a plea of guilty ... is made before sentence is imposed, the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason." Fed.R.Crim.P. 32(d).

---

**4.** Your Honor, I was involved in the use of drugs very heavily during this time period. I'm not using that as an excuse for my actions, but ... *later I found out that [Buzzitta] lied* to the federal agents regarding my background, *and so the purpose of this hearing to me, why I asked for this situation [to withdraw the guilty plea] is so that I could get a trial, and that these elements would be brought out in a trial situation* with a jury to decide the level of culpability that I am responsible for. *And that's basically it.* I just cannot—I frankly cannot believe some of the *allegations in the presentence report,* and that they were—*and this is after I made my decision to withdraw my plea,* but they just further *fuel the fire* that tells me that this whole investigation is based—is predicated on lies by the informant [Buzzitta]. And *if in*

*fact he lied to the federal agents and lied to me, then there are issues that need to be discussed at trial.*

I'm not innocent of trafficking in drugs, *but not to the extent* that I'm being indicted for. *And that's what I want to establish, and the only way I can see to do that is to have a trial.*
JA at 117–18 (emphasis added).

**5.** The relevant text of the district court's ruling on the motion to withdraw the guilty plea, insofar as it mentions "mandatory minimums," is Appendix II to this opinion (R. 50, pp. 113–14). It is clear to this writer that the district court is referring to avoidance of *state* habitual criminal charges that would carry such penalties as one of defendant's reasons for pleading guilty.

Courts have noted that the aim of the rule is to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant "to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes he made a bad choice in pleading guilty."

*United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir.1991) (quoting *United States v. Carr*, 740 F.2d 339, 345 (5th Cir.1984)), *cert. denied*, —— U.S. ——, 112 S.Ct. 1231, 117 L.Ed.2d 465 (1992). In determining whether a defendant invoking Rule 32(d) has shown a "fair and just reason," this court considers such factors as those set forth in *Alexander* and in *United States v. Head*, 927 F.2d 1361, 1375 (6th Cir.) (citing *United States v. Spencer*, 836 F.2d 236, 238 (6th Cir.1987)), *cert. denied*, —— U.S. ——, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991). These include: (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

■ In this case, eleven days after entering his February 11 plea, Bashara complained to the probation officer assigned to prepare his PSI, regretting that he had entered the plea. He called his attorney, but he was not advised to withdraw his plea. He was then hospitalized for two weeks. On March 29, Bashara wrote a formal letter to the court, explaining the reasons that he wanted to withdraw his plea. On April 13, he formally moved to withdraw the plea. A hearing was held on April 19. At the hearing, the court allowed Bashara to waive the attorney-client privilege and ordered Attorney Mitchell to testify. However, because Bashara was about to conduct his hearing

without the assistance of counsel, the court postponed the hearing until the following morning, at which time a new defense counsel, Chamberlain, was at Bashara's side.

Bashara claimed that he felt that Attorney Mitchell had pressured him to plead guilty because the attorney was not adequately prepared to conduct a defense.[6] Mitchell testified that, even on the day that he pleaded guilty, Bashara continued to feel that the government had a very weak case. However, Bashara conceded at the hearing that he "was involved in the use of drugs very heavily during this time period. . . . I'm not innocent of trafficking in drugs, but not to the extent that I'm being indicted for."

Under this court's *Alexander/Head* analysis, although Bashara may have regretted his plea a mere eleven days after entering it, he allowed six weeks to pass before filing a formal motion to withdraw it. He explained that the delay was caused by difficulty in contacting his attorney, but the court found that, with two prior convictions, Bashara amply knew how to contact counsel if he wanted ed. The court observed that Bashara admitted substantial drug involvement and did not assert his innocence. In addition, the court found that Bashara's long, detailed answers to brief questions about his involvement in the crimes to which he had pleaded, reflected an "intelligent" acknowledgement of guilt. Therefore, the court found that Bashara's plea was not the result of "a hastily entered plea made with an unsure heart or a confused mind." We find no abuse of discretion.

## IV

■ Bashara also contests the court's determination that his crime involved more than 100 kilograms of marijuana or its equivalent. We will not reverse a district court's findings of fact unless they are clearly erroneous. The district court found that Bashara was paying Okane $200 a gram for heroin; therefore, having wired more than $41,000 to California, Bashara would have purchased more than 200 grams of heroin. Even if he were paying Okane 50% more than this find-

---

6. At the time of this case, Mitchell had been practicing as an attorney for twelve years, and 95% of his practice was devoted to criminal cases.

ing—to wit, $300 a gram—Bashara would still have purchased over 130 grams. Under U.S.S.G. § 2D1.1, comment. (n.10) ("Drug Equivalency Table"), one gram of heroin is equivalent to one kilogram of marijuana.

In addition, the court looked at Buzzitta's testimony. The court acknowledged that "[n]o one else has testified, given testimony under oath here except for this Mr. Buzzitta. Not a very credible individual, a rather evasive individual, I might add for the record." However, the court noted Buzzitta's consistent testimony that Bashara had told him that he had driven car shipments of drugs from Texas to Michigan, on two or three occasions, each time transporting approximately 80–90 pounds of marijuana. By comparing Buzzitta's figures with the amount of money that Bashara spent on his heroin purchases from Okane, the court found that Buzzitta's numbers were more credible than the alternative claim of Bashara.[7]

█ Bashara argues that his purchases from Okane were not part of his drug trafficking; rather, those were purchases for his personal use. Therefore, he maintains that the Western Union records are not relevant to the crime for which he has been indicted. However, the Western Union records are directly pertinent to the money-laundering count, and they provide strong circumstantial evidence to support the quantity alleged in the marijuana-conspiracy count. Therefore, we do not find the district court's calculations to be clearly erroneous.[8]

## V

The court found, under U.S.S.G. § 3B1.1(b), that Bashara deserved a three-level sentencing enhancement because he was the manager or supervisor of a criminal activity that involved five or more participants. Bashara appeals from that finding. We review for clear error.

Bashara emphasizes that the activity in which he was involved was not a powerful conspiracy or sophisticated drug organization. Rather, he says that he was compelled to pick up marijuana in Texas on behalf of Sillman, a supplier in Grand Rapids who essentially controlled *him* because Bashara owed Sillman substantial debts from prior loans. Therefore, he merely drove down to Texas two or three times, picked up shipments for delivery, and then drove back to Michigan to sell Sillman's marijuana for the cash he needed to feed his own heroin addiction. Essentially, Bashara portrays himself as an individual, indicted alone by the grand jury, personally ruined by a consuming drug addiction, but not involved as a "manager" of a "drug ring." In Bashara's words, "The chairman of the board of General Motors does not drive the delivery trucks." Indeed, the court did not find him to be an "organizer or leader," which would have added another offense level to the sentencing enhancement. U.S.S.G. § 3B1.1(a).

"It is well established in this Circuit that 'enhancement pursuant to § 3B1.1 requires the participation of at least two culpable individuals so that leadership of some criminal enterprise or organization, however minimal, can be claimed.' ... But these principles do not mean that the defendant must directly employ or control a partnership or enterprise." *United States v. Schultz*, 14 F.3d 1093, 1099 (6th Cir.1994) (citations omitted). "To be a manager, a defendant in a drug conspiracy need not control or manage the activities of the co-conspirators—it is sufficient that the facts show that the defendant

---

**7.** Bashara maintained that, on each of his two or three trips from Texas, he transported only 15–20 pounds per trip.

**8.** In any event, it is not clear that Bashara would benefit perceptibly by proving that he conspired to buy and sell less than 100 kilograms of marijuana. Under count 1, the marijuana-trafficking conspiracy charge, the base offense level is 26. U.S.S.G. § 2D1.1(c)(9). Count 2, the money-laundering crime, carries a base offense level of 23 under U.S.S.G. § 2S1.1(a)(1), with an automatic three-level enhancement because the de-

fendant knew that the funds were the proceeds of unlawful drug activity. *Id.* § 2S1.1(b)(1). Therefore, under count 2 as well, Bashara would have faced a sentence starting with a base offense level of 26. Consequently, even if his marijuana trafficking had involved less than 100 kilograms, he would have still emerged with the same 97–month prison sentence, although the subsequent period of supervised release under count 2 alone would have been for three years, rather than five.

managed the criminal *activity.*" *United States v. Lawrence*, 918 F.2d 68, 72 (8th Cir.1990), *cert. denied*, 499 U.S. 941, 111 S.Ct. 1399, 113 L.Ed.2d 455 (1991) (emphasis added). Indeed, one can be a "manager" or "supervisor" even when playing a role subordinate to other participants in the activity:

> [T]he language of the Guideline ... refers not to "subordinates" but to "participants," thus encompassing those on an equal footing or superior to defendant in a criminal hierarchy as well as those below.

*United States v. Dean*, 969 F.2d 187, 197 (6th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1852, 123 L.Ed.2d 475 (1993); *accord United States v. Jones*, 933 F.2d 1541, 1546–47 (11th Cir.1991).

The commentary to U.S.S.G. § 3B1.1 lists seven factors that may be considered in determining the extent of a defendant's role in the criminal activity: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. *Id.* comment. (n.3). As we have recently noted, "[t]here is no requirement, however, that each factor be met." *United States v. Ospina*, 18 F.3d 1332, 1337 (6th Cir.1994).

In *United States v. Barrett*, 890 F.2d 855, 867 (6th Cir.1989), this court upheld a determination that the defendant played a managerial role, based on findings that he was the source of cocaine for three or four people whom he supplied, that he brought drugs into Tennessee after obtaining them in Florida, and that "we're dealing here with a fairly large amount of drugs, at least in the kilo-grams [of cocaine], as far as those drugs being taken, the amounts of drugs being taken up here from Florida periodically." *Cf. United States v. Martinez*, 951 F.2d 887, 890 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1695, 118 L.Ed.2d 407 (1992) (holding a defendant to be a manager because of his role in traveling to Miami to acquire cocaine and then bringing it back to Minnesota, where he maintained possession of it and acted as the source of the cocaine that he and his co-conspirators distributed).

In this case, the record shows that Bashara was involved with Buzzitta in obtaining and selling drugs. Buzzitta provided Bashara with as much as ten pounds of marijuana on three separate occasions, and Bashara sold marijuana to Buzzitta in ten-pound quantities on various other occasions. Later, Buzzitta sold some of the marijuana that he had purchased from Bashara to a third party, Andrew Sinadinos.

Besides his dealings with Buzzitta, Bashara worked with Sillman in Texas to obtain marijuana for transport to Michigan, and he personally transported those drugs on two or three occasions. He concedes that he was involved in the sale and distribution of marijuana in both Grand Rapids and Lansing, and that he used his Grand Rapids residence as "a staging point or a selling point or a storing point for the marijuana."[9] Joint Appendix at 86. He further concedes that he pooled his funds and the proceeds of his marijuana sales with money provided by other drug users, and then handled their transactions as well as his own, helping the "drug pool" obtain discounted prices from Okane. Joint Appendix at 115–16. He made at least sixty-five different money transfers, wiring marijuana proceeds to Okane in California in exchange for new heroin shipments that were packaged, in accordance with his scheme, in

---

9. Interestingly, in challenging the judge's findings that he had been involved in the sale and distribution of marijuana in Grand Rapids, Lansing, "and elsewhere," Bashara states that "[t]his conclusion is *not* wholly *un*supported by the record." Defendant–Appellant's Brief (corrected copy) at 22 n. 9 (emphasis added).

Similarly, Bashara attempts to characterize what he told Buzzitta as "mere bragging and puffing." Defendant–Appellant's Brief (corrected copy) at 24. It seems from the record that the court relied heavily on the Western Union transactions with Okane, and the "mere bragging and puffing" merely corroborated the hard monetary statistics. It is also worth noting that, by characterizing the "bragging and puffing" comments as he does, Bashara inadvertently lends credence to Buzzitta's testimony that he did in fact utter such words to Buzzitta.

compact-disc cases and film-reel tins. He also transacted deals with a California marijuana supplier named Scott Weaver.[10]

As we consider the facts of this case in light of the seven factors listed in the commentary to U.S.S.G. § 3B1.1, we observe that Bashara exercised decision-making authority by playing a central role in coordinating the "drug pool," collecting the buyers' funds, negotiating the purchase price with Okane, and wiring the payments to California. Furthermore, Bashara conceived and authorized the strategic decision to disguise the drugs that were sent to Michigan as objects relating to his concert-promotion business. His personal participation was all-encompassing, ranging from picking up the marijuana in Texas, to transporting it to Michigan, to selling it on the street, and to buying the heroin from California suppliers. He recruited accomplices, including members of the drug-purchasing pool. He derived significant profits from the Sillman shipments. The scope of the activity ranged geographically from Texas to Michigan to California. It included selling marijuana and buying heroin. It called for transporting goods interstate by car and wiring funds interstate via Western Union.

■ As our previous opinions in *Schultz, Dean,* and *Barrett* make clear, it was not necessary for the district court to find that Bashara had five accomplices working for him in order to justify enhancing his sentence by three offense levels because "the defendant was a manager or supervisor ... and the criminal activity involved five or more participants...." U.S.S.G. § 3B1.1(b). The text of the Guidelines and its commentary does not require that five of the activity's participants be subordinate to the defendant; it merely requires that the activity involve five or more participants. In this case, at least five people participated in Bashara's criminal drug activity, and he played a role that may properly be categorized as that of "manager or supervisor."

Therefore, the district court's findings are not clearly erroneous.

## VI

■ Finally, Bashara appeals from the court's decision to reduce his sentence by only two offense levels, rather than by three, after he accepted responsibility for his actions. Under U.S.S.G. § 3E1.1(a), a defendant who "clearly demonstrates acceptance of responsibility for his offense" may receive a two-level sentence reduction. Moreover:

If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:

(1) timely providing complete information to the government concerning his own involvement in the offense; or

(2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently, decrease the offense level by 1 additional level.

*Id.* § 3E1.1(b).

The court considered Bashara's application for a three-level reduction under § 3E1.1(b) carefully and described it as a "very close question." However, it ultimately decided to grant him a reduction, but to limit the reduction to two levels, because Bashara waited until the last five days before his trial to enter his guilty plea. By waiting so long to accept responsibility, Bashara compelled the government to prepare its entire case for trial. Afterwards, when he attempted to withdraw his guilty plea, his motion again required the government and the court to conduct hearings, research and review briefs

---

**10.** There may have been as many as five more individuals involved with sending and receiving the Western Union money transfers. According to the Presentence Investigation Report, "[a] review of the investigative file also indicates that three other individuals[,] Richard Felice, Joan Weaver, and Mary Fannin Weaver, were responsible for sending Western Union money transfers to California where those monies were received by either Dan O[]kane, Scott Weaver, David Weaver, or Dave Sadler."

of counsel, and render a decision. Therefore, the court's factual findings in this regard were not clearly erroneous.

## VII

For the foregoing reasons, the judgment of the district court is AFFIRMED.

### APPENDIX I

### GUILTY PLEA HEARING

THE COURT: Are there any questions about these charges that I could answer for you at this time?

DEFENDANT BASHARA: No, Your Honor.

THE COURT: Do you understand that these charges carry certain penalties which I must advise you of, and that is the penalty for conspiracy to possess with intent to distribute and distribute marijuana carries a possible prison sentence of up to 40 years in prison and/or up to a $2 million fine with a special release provision if there is confinement of up to five years following confinement. Do you understand this? As a maximum sentence?

DEFENDANT BASHARA: Yes, Your Honor.

THE COURT: As to the charge that I will refer to as money laundering, the second count, do you understand this carries a potential penalty of up to 20 years' imprisonment and/or up to a $500,000 fine with a supervised release should there be confinement of up to three years? Do you understand this?

DEFENDANT BASHARA: Yes.

THE COURT: And that this Court would be required to assess $50 as a mandatory special assessment for each count for a total of $100 if your guilty plea were to be accepted by this Court in this matter. Do you understand this?

DEFENDANT BASHARA: I do, Your Honor.

THE COURT: Mr. Redford, are there any special sentencing provisions as it pertains to these two counts as of today in addition to these that I've enumerated.

MR. REDFORD: Not as of today, Your Honor, not that I'm aware of.

THE COURT: Okay. Mr. Mitchell, are there any other sentencing provisions which you're aware of that should be discussed here at this time?

MR. MITCHELL: No, Your Honor.

### APPENDIX II

### HEARING ON MOTION TO WITHDRAW GUILTY PLEA

THE COURT: I want the Court of Appeals to further go back to the plea that was entered on February 11th, both my own worksheets on this matter, my own memory of these proceedings, the refreshment of my memory that the transcript, which will go to the Court of Appeals, as well, which is some 24 pages long, contains. It contains rather lengthy colloquy. I might add it's to the point. There's not a lot of unnecessary verbiage in it. But it clearly indicates that counsel knew and professed himself, both counsel, both the government and defense counsel, to know exactly what they intended to do, and that is a plea was to be entered to the Court, and the indictment was to be ready, and that there was no plea agreement that was sought to be placed on the record.

Now it appears that the agreement which was had that was not to be made part of the record and for which apparently there has been no objection nor any evidence to the contrary, is that this indictment and a plea to this indictment was to satisfy a liability that the defendant might have to a state court on another matter as well as placing jeopardy upon any further indictments that might be issued, particularly indictments that go to habitual criminal status, which carry certain mandatory minimums. And if that in fact is the case and I find no objection to that, then that certainly would demonstrate to this Court that from, at least from the defendant's perspective, there was certainly an incentive to enter the plea to the defendant.

Now, the indictment was read at some length and the defendant clearly indicated in the colloquy following the indictment that he intended to plead guilty. The Court went through each and every one of the Rule 11 requirements at some length, and in each one Mr. Bashara indicated clearly that he understood them.

MERRITT, Chief Judge, dissenting.

The record in this case clearly establishes, and the district court found, that the defendant pled guilty on the specific understanding that the government would not seek a mandatory minimum sentence and that he would not run the risk of subjecting himself to such a sentence. (See Appendix II and R. 50, pp. 113–14.) Both the prosecutor and defendant's lawyer specifically advised the court at arraignment that no such "special provision" was present in this case. (See Appendix I and R. 37, pp. 4–10.) Upon learning of the risk of a mandatory minimum sentence, the defendant sought to withdraw his guilty plea and proceed to trial.

The district court obviously violated its duty under Rule 11(c), Fed.R.Crim.P. to "inform the defendant of ... the mandatory minimum penalty provided by law...." The language of the rule is mandatory, not within the discretion of the district court. Once the district court learned that it had violated the rule it should have allowed the defendant to withdraw his guilty plea, especially in light of the fact that it is clear that the defendant was misled into believing that there would be no mandatory minimum sentence involved.

The majority finds that the district court was aware of the mandatory minimum and yet failed to inform the defendant of it. Nevertheless, the majority apparently follows the principle that this provision of Rule 11 may be ignored by district judges if the sentence imposed is longer than the mandatory minimum sentence. No other circuit has adopted such a principle. *See United States v. Hourihan,* 936 F.2d 508, 511 (11th Cir.1991) (in order to invoke harmless error government must show defendant knew independently that she would likely receive mandatory minimum sentence and was not misled); *United States v. Jaramillo–Suarez,* 857 F.2d 1368, 1372 (9th Cir.1988) (same). I do not understand the rationale for such a principle or why we should permit the Rule to be openly violated.

Harmless error cannot simply be based on the court's assumption that the defendant will be convicted if he is tried and will receive a sentence longer than the mandatory minimum. There would always be harmless error if we make this assumption. The defendant is entitled to exercise his constitutional right to trial by jury after knowing of "the mandatory minimum penalty provided by law." That is the reason for the Rule. Not only was he not advised in this case; he was affirmatively misled. When a defendant entering a guilty plea is told something that is not true (viz., no risk of a mandatory minimum sentence in this case), I see no "risk of terminological inexactitude," as the court puts it, in saying that he was "misled." Here we are denying the defendant the right afforded by the Rule in combination with the Sixth Amendment without offering a reasoned or plausible explanation. Our obligation to the Rule of Law requires more than we are giving the accused in this case.